IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


**MELISSA LAURIE VICTORY**                                          **PLAINTIFF**


**v.**                          **NO. 3:25-cv-00127-PSH**


**FRANK J. BISIGNANO, Commissioner**                    **DEFENDANT**
**of the Social Security Administration**


### MEMORANDUM OPINION AND ORDER


Plaintiff Melissa Laurie Victory ("Victory") challenges the denial of her application for disability insurance benefits. She maintains that she was found to be capable of a reduced range of light work, but she cannot walk, sit, or stand for long periods. Victory also maintains that the Administrative Law Judge ("ALJ") erred in resolving an apparent conflict between the testimony of a vocational expert ("VE") and the Dictionary of Occupational Titles ("DOT") and in identifying the number of available jobs. Because substantial evidence on the record as a whole supports the ALJ's decision, and the decision is not based on any legal error, this case will be dismissed.[1]

---

[1]     The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

The record reflects that Victory was born on March 4, 1972, and was forty-three years old on March 16, 2015, the amended alleged onset of disability date. She alleged that she became disabled and unable to work as a result of the "combined effects of cervical degenerative disc disease, radiculopathy status post anterior cervical discectomy and fusion at C4-6, post laminectomy syndrome, degenerative disc disease of the lumbar spine, polyneuropathy of the bilateral lower extremities, osteoporosis, and peripheral vascular disease." See Docket Entry 13 at 28. Her insured status for benefits expired on June 30, 2022, or when she was fifty years old. The relevant period in this case is therefore from March 16, 2015, through June 30, 2022.

In the ALJ's decision denying Victory's application, the ALJ summarized the evidence. See Transcript at 14-18. The Commissioner of the Social Security Administration ("Commissioner"), in his brief, adopted the ALJ's summary. See Docket Entry 19 at CM/ECF 3. Victory, in her brief, also summarized the evidence, albeit in much greater detail. See Docket Entry 13 at CM/ECF 2-25. There is no dispute about the evidence, and it is not necessary to recite it in any detail. Instead, the Court will merely recite some of the evidence germane to Victory's assertions of error in addressing her assertions.

Victory maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers three reasons why. First, Victory maintains that her residual functional capacity was erroneously assessed.[2] She so maintains because a reduced range of light work—the work she was found to be capable of performing—requires a claimant to be capable of standing or walking for a total of six hours in an eight-hour workday, and she cannot walk, sit, or stand for long periods. She also notes that the record does not contain a medical source opinion from a medical provider, and without such, the ALJ was left to draw his own inferences about Victory's work-related limitations.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, and the assessment must be supported by some medical evidence. See Jones v. Astrue, 619 F.3d 963 (8th Cir. 2010).

---

[2] The ALJ uses a five-step sequential evaluation process to decide disability claims. Between steps three and four, the ALJ determines the claimant's residual functional capacity. At step four, the ALJ determines whether the claimant has the ability to perform her past work. If the claimant cannot perform her past work, or she had no past work, the ALJ moves to step five where he determines whether the claimant can perform jobs in the national economy.

Here, the ALJ assessed Victory's residual functional capacity between steps three and four of the sequential evaluation process. He found that through June 30, 2022, she had the residual functional capacity to perform light work with the following additional limitations:

> ... no climbing ladders, ropes, or scaffolds; can frequently climb ramps and stairs, crouch, and kneel; can occasionally stoop and crawl; should avoid concentrated exposure to excessive vibration, unprotected heights, and hazardous machinery; and [Victory] can occasionally reach overhead bilaterally.

See Transcript at 13.

Clearly, Victory suffers from impairments that impact her ability to walk, sit, or stand, impairments that include degenerative disc disease and polyneuropathy of the bilateral lower extremities. The impairments have been treated with surgery, medial branch blocks, radiofrequency ablations, physical therapy, and narcotic medication. The question is whether substantial evidence on the record as a whole supports the ALJ's finding that Victory was capable of standing or walking for a total of six hours in an eight-hour workday. The relevant evidence is conflicting and capable of more than one acceptable characterization. The ALJ embraced one of the characterizations, and he could properly find as he did.

With respect to the medical evidence, the record reflects that prior to March 16, 2015, Victory was diagnosed with impairments that included "... cervical spondylosis, spinal stenosis, and disc herniation C4-5 and C5-6." See Transcript at 359. She also experienced "severe neck and bilateral arm pain, numbness, tingling, and weakness." See Transcript at 358-359. She was treated with, inter alia, multiple lumbar injections. See Transcript at 1325.

On March 16, 2015, Victory underwent a "C4-5 and C5-6 microsurgical cervical anterior discectomy, C4-5 and C5-6 interbody fusion with corticocancellous allograft ..., and [i]nternal fixation C4-5 and C5-6 with plate and screws ..." See Transcript at 358. Following the surgery, she reported doing "great" and denied any problems. See Transcript at 354. Subsequent imaging of her spine and bilateral lower extremities was largely unremarkable, see Transcript at 334-335, 903, although some moderate sensory polyneuropathy and degenerative changes in her lower thoracic and lumbar spine were observed, see Transcript at 334-335.

Victory continued to seek medical attention for her neck and back pain throughout the relevant period. The testing and progress notes from her presentations reflect findings that the parties selectively emphasize.

For instance, Victory emphasizes the following, which is supported by record:

> ... On physical exam in September 2019, palpation of the lumbar facet joints at L3-4 through L5-S1 levels reproduced lower back pain. Anterior flexion, hyperextension and bilateral lateral flexion/bending and bilateral lateral rotation caused pain in the bilateral multifidus muscles. (Tr. 409-13, 483-87). On April 30, 2020, Victory's gait and station were antalgic, and she complained of low back and leg pain. (Tr. 670-73, 856-59). On July 7, 2020, Dr. Bromley noted that Victory had abnormal hyperextension of the lumbar spine which reproduced back pain. Bilateral facets loading maneuver reproduced lower back pain. Bilateral lateral rotation caused pain. Dr. Bromley renewed her prescription for Norco 7.5-325, increased her Baclofen to three times a day, and prescribed 50 mg of Trazodone at bedtime. (Tr. 662-66, 846-50). At a PTCA follow up visit on August 17, 2021, Victory reported back pain, joint pain, limited joint movement, muscle tenderness, an unsteady walk, and leg weakness. Her prescription for Norco was renewed. (Tr. 566-70, 754-58). At a visit to the pain clinic on January 27, 2022, Victory complained of increased lower back and leg pain. Her APRN ordered physical therapy, recommended MRIs of Victory's lumbar and cervical spine, and renewed her prescriptions for Norco, Sumatriptan, and Baclofen. (Tr. 537-39, 720-24, 1103-04). Victory returned to pain management on March 29, 2022. On physical exam, Victory's gait and station were antalgic. Palpation of the lumbar facet joints reproduced lower back pain. Hyperextension of the lumbar spine reproduced lower back pain. Bilateral facets loading maneuver caused pain. Bilateral lateral rotation caused pain. It was noted that Victory had recently completed six weeks of physical therapy in-house with Dr. Kern, which had only provided minimal relief. (Tr. 1074-78, 1260-64).

See Docket Entry 13 at CM/ECF 42-43. The Commissioner emphasizes the following, which is also supported by the record:

> ... The ALJ discussed physical examinations showing tenderness to palpation of [Victory's] neck and lower back as well as decreased ranges of motion (Tr. 15, 352, 377, 411, 615, 721, 820, 838, 1307, 1310, 1325). However, he also noted neurological examinations were normal, a majority of straight leg raises were negative [footnote seven: The ALJ noted that [Victory] had positive straight leg raises on one occasion (Tr. 17, 721)], muscle strength and tone were normal, and sensation was generally normal [footnote eight: The ALJ noted [Victory] underwent an electromyography (EMG) and nerve conduction study (NCS) during the period at issue, which showed moderate sensory polyneuropathy but no electrophysiological evidence of myopathy or radiculopathy (Tr. 15, 903). Additionally, physical examinations during the period at issue showed [her] sensation was generally found to be intact (Tr. 485, 524, 656, 838, 1431, 1434)] (Tr. 15, 16, 377, 411, 484-85, 721, 1307, 1325). ...

See Docket Entry 19 at CM/ECF 14. The ALJ considered the aforementioned medical evidence, as well as other medical evidence, in crafting Victory's residual functional capacity, and the ALJ's characterization of that evidence is one of the acceptable characterizations.

In assessing Victory's residual functional capacity, the ALJ also considered the findings of the state agency medical consultants, both of whom opined that Victory was capable of a reduced range of light work. See Transcript at 17-18. The ALJ did not overly value the consultants' findings, as he simply found that their findings were "persuasive to the

extent they are consistent with the residual functional capacity [for a reduced range of light work].” See Transcript at 18.

The ALJ also noted the non-medical evidence relevant to Victory's residual functional capacity, and the ALJ's characterization of that evidence is an acceptable characterization. For instance, he could and did note that she worked part-time from 2017 through 2022. See Transcript at 14. The work involved performing simple tasks, and she stopped working because her symptoms grew more severe. See Transcript at 39, 43-44. The ALJ could and did also note that Victory reported doing household chores, shopping in stores, and caring for her two-year-old granddaughter one or two times a week. See Transcript at 14, 52-53.

Victory faults the ALJ for failing to obtain medical source opinions from Victory's medical providers. It is true that there is no medical opinion specifically addressing her ability to perform work-related activities. While such an opinion would have been helpful, one was not required. See Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016). He could and did rely upon the medical records prepared by her attending physicians and her subjective representations, and he could make the assessment he did.

It is not the role of the Court to re-weigh the evidence and, even if the Court would decide the case differently, it cannot reverse the ALJ's

decision if that decision is supported by good reason and is based on substantial evidence. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D. 2016). In fact, the Court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. See Id. Here, the evidence is capable of more than one acceptable characterization, and the ALJ could properly find as he did.

Victory offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Victory maintains that the ALJ failed to resolve an apparent conflict between a VE's testimony and the DOT. Specifically, Victory notes that she was limited to occasional overhead reaching with her upper extremities, but the jobs the VE identified—the jobs the ALJ found Victory could have performed—require the ability to engage in frequent reaching. It is Victory's contention that the apparent conflict was never resolved.

Step five of the sequential evaluation process requires the ALJ to show that the claimant could have performed other jobs. See Crawford v. Colvin, 809 F.3d 404 (8th Cir. 2015). In making the showing, the ALJ may rely upon a VE's testimony in response to "a properly formulated hypothetical question," see Gann v. Berryhill, 864 F.3d 947, 952 (8th Cir. 2017), but the testimony must "generally be consistent with the DOT." See

Peters v. Berryhill, 4:16-cv-01342-PLC, 2018 WL 1858159, 2 (E.D.Mo. 2018). If there is an "apparent unresolved conflict" between the VE's testimony and the DOT, the ALJ must elicit "a reasonable explanation" for the conflict and resolve the conflict by determining if the explanation provides a basis for relying on the VE's testimony rather than the DOT. See Moore v. Colvin, 769 F.3d 987, 989 (8th Cir. 2014). Absent adequate rebuttal, testimony from a VE that conflicts with the DOT does not constitute substantial evidence upon which the ALJ may rely in meeting his burden of proving the existence of other jobs the individual could perform. See Id. at 990.

Here, a VE testified during the administrative hearing. See Transcript at 53-57. He was asked whether there were jobs available in the national economy for a hypothetical individual with Victory's residual functional capacity for a reduced range of light work, one limitation being the ability to "reach overhead bilaterally on an occasional basis." See Transcript at 54. The VE testified that jobs were available at the light exertional level, the jobs being a price marker (DOT 209.587-034) and cafeteria attendant (DOT 311.677-010). See Transcript at 53-54. He also identified two jobs at the sedentary exertional level, the jobs being a fishing reel assembler (DOT 732.684-062) and "inspecting jobs, such as a table worker" (DOT 739.687-

182). See Transcript at 55. The ALJ and VE then had the following

exchange:

> ALJ: And thus far, is your testimony consistent with the
> DOT, and where the DOT is silent, such as failing to specifically
> address the overhead reaching limitation, could you go and just
> explain your experience and training in that overhead reaching
> limitation, and why it is your position that these jobs fit that
> profile?
>
> VE: Yes, sir. I do have 27 years' experience as a vocational
> rehab counsel. And my training, I have a master's degree. And
> also, I am familiar with the DOT description of these jobs, and
> especially when you get to the sedentary, these people are
> seated, working out in front of their bodies, so these are not –
> this does not require any overhead whatsoever. And at the light
> level, I am familiar with those jobs, and I submit the same as
> my testimony.

See Transcript at 55-56. The ALJ adopted the VE's testimony and found at

step five that there were jobs Victory could have performed. As a part of

so finding, the ALJ found the following:

> Pursuant to SSR 00-4p, I have determined that the vocational
> expert's testimony is consistent with the information contained
> in the [DOT], except with respect to [the] overhead reaching
> limitations, which is based on the vocational expert's
> professional experience and training.
>
> Based on the testimony of the vocational expert, I conclude
> that, through the date last insured, considering [Victory's] age,
> education, work experience, and residual functional capacity,
> [she] was capable of making a successful adjustment to other

work that existed in significant numbers in the national economy. ...

See Transcript at 19.

Victory's assertion of error requires the Court to re-enter the "reaching" morass that has resulted in confusing decisions.[3] The Court will not attempt to reconcile those decisions but simply notes that the more specific or detailed the testimony is about the actual jobs identified by the VE, the more favorably the testimony is viewed. For instance, in Smith v. Kijakazi, No. 3:21-cv-00201-PSH, 2022 WL 17361453, 1 (E.D.Ark. Dec. 1, 2020), a VE's statement that his testimony was based on his "[thirty-four] years of experience in the field of vocational rehabilitations and job placement, labor market research, and conducted probably over [one thousand] job analyses" was not adequate to resolve an apparent conflict. In Manuel v. Saul, No. 3:20-cv-00034-PSH, 2020 WL 6200186 2 (E.D.Ark. Oct. 22, 2020), a VE's statement that his testimony was based on his "past experience with these and similar jobs" was not adequate to resolve an apparent conflict. In Jones-Brinkley v. Commissioner of Social Security Administration, No. 3:20-cv-00058-JTK, 2021 WL 371689, 2 (E.D.Ark. 2021),

---

[3]     See Bass v. Saul, No. 3:20-cv-00167-BD, 2021 WL 1813181, 3 (E.D.Ark. 2021) ("There are a number of cases involving reaching conflicts in this Circuit, and the decisions are not all aligned.")

though, a VE's statement that his testimony was based on his "experience and judgment about the job requirements" was adequate to resolve an apparent conflict.

In Stockwell v. Commissioner of the Social Security Administration, No. 3:20-cv-00393-JTK, 2021 WL 5758876 (E.D. Ark. Dec. 3, 2021), United States Magistrate Judge Jerome T. Kearney offered his observations about the various "reaching" decisions. He observed the following:

> Cases from this Circuit have wrestled with the issue about how the VE responds when asked about a possible conflict. In cases where the VE just cited to his "experience," courts have reversed and remanded. Humphrey v. Berryhill, 2019 U.S. Dist. LEXIS 50243, 18, 2019 WL 1359286 (E.D. Mo. March 26, 2019) (remand was proper in the face of a DOT conflict where the VE provided "no insight into the issue"); Hackworth v. Comm'r of SSA, 2021 U.S. Dist. LEXIS 141386, 7-8, 2021 WL 3215095 (E.D. Ark. July 29, 2021) (VE's reliance on experience alone did not clear the bar); Montoya v. SSA, 2019 U.S. Dist. LEXIS 99311, 2019 WL 2482719 (E.D. Ark. June 13, 2019) (in the face of reaching conflict, VE's response that he relied on his "experience" to address conflict was insufficient).
>
> But where the VE talks just a bit more about his experience with the jobs identified or jobs that are similar, courts have found no error. Yeley v. Berryhill, 2018 U.S. Dist. LEXIS 154465, 25-27, 2018 WL 4333617 (E.D. Mo. Sept. 11, 2018) (ALJ properly relied upon VE's response that "in his experience" claimant would be able to perform jobs identified, and he gave more detail about the assigned limitations); Jones-Brinkley v. SSA, 2021 U.S. Dist. LEXIS 20302, 6-7, 2021 WL 371689 (E.D. Ark. Feb. 3, 2021) (VE may rely on his judgment and experience with the jobs in question to resolve any possible conflict);

Porter v. Berryhill, 2018 U.S. Dist. LEXIS 37141, 42, 2018 WL 1183400 (W.D. Mo. Mar. 7, 2018) (VE's response that his testimony was "supplemented by his knowledge and experience of human resources and work practices in business and industry" was sufficient to resolve the conflict with respect to reaching).

An Eighth Circuit case presented this issue of conflict between VE testimony and the DOT, and the Court reversed the ALJ where the VE only called on experience to resolve the conflict. Stanton v. Comm'r, SSA, 899 F.3d 555 (8th Cir. 2018).

But in that case, the conflict concerned reasoning levels of the jobs and not overhead reaching. Id. And more importantly, in Stanton, the ALJ only used boilerplate language to address the conflict in her decision; here the ALJ provided (just a bit) more detail. This is indeed a close call, given the wide-ranging results from other cases in this Circuit; but the VE's testimony here was just sufficient enough, and Stockwell's attorney raised no objection.

See Id., 2021 WL 5758876, 4–5. The "(just a bit) more detail" provided by the VE in Stockwell v. Commissioner of the Social Security Administration was his statement as to the following: "in considering these examples, I've had to fall back on my past experience with these and similar jobs." See Id. at 4.

The Court begins by noting that although the phrase used in the ALJ's hypothetical question, i.e., "reach overhead bilaterally on an occasional basis," see Transcript at 54, is not defined in the DOT, certain terms within

14

the phrase are.[4] At a minimum, though, an apparent unresolved conflict exists between the VE's testimony that an individual who can only occasionally reach overhead bilaterally would have been capable of working the jobs identified by the VE, all of which require frequent reaching.

Here, the ALJ recognized that the DOT does not "specifically address the overhead reaching limitation" and asked the VE to explain the conflict and how it might be resolved. See Transcript at 55. The ALJ testified that the jobs he identified do not require overhead reaching and based his testimony, in part, on his twenty-seven years of experience as a vocational rehab counsel, his having received a master's degree, his familiarity with the DOT descriptions of the jobs, and his familiarity with the jobs. Had the VE stopped there, the Court would likely follow Smith v. Kijakazi and Manuel v. Kijakazi, find his testimony inadequate to resolve the conflict, and order a remand. The VE, though, based his testimony on something more, as he also described in some detail the reaching requirements of the jobs. Specifically, he testified to the following:

---

[4]     For instance, "reaching" is defined in the Selected Characteristics of Occupations, a DOT companion publication, as "extending the hands and arms in any direction." See Kemp v. Colvin, 743 F.3d 630, 632 (8th Cir. 2014). "Occasionally" is defined as an activity that occurs up to 1/3 of the time. "Frequently," in turn, is defined as an activity that occurs between 1/3 and 2/3 of the time.

> ... when you get to the sedentary, these people are seated, working out in front of their bodies, so these are not – this does not require any overhead whatsoever. And at the light level, I am familiar with those jobs, and I submit the same as my testimony.

See Transcript at 56. His testimony, though certainly not a model of clarity, demonstrates that he is indeed familiar with the demands of the jobs.[5] The ALJ could therefore rely upon the VE's testimony at step five and find that Victory could have worked those jobs.

Victory offers a third reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Victory maintains that the ALJ erred when he identified jobs that do not exist in sufficient numbers in the national economy. It is Victory's contention that the sedentary jobs, i.e., fishing reel assembler and inspecting jobs, such as a table worker, do not exist in sufficient numbers. With respect to the jobs at the light exertional level, she contends the following: "That leaves only the two light jobs, for which the VE failed to offer anything to explain or

---

[5]    The VE's use of the term "same" with respect to the jobs involving light work is unfortunate but not fatal. The Court understands "same" to mean that the reaching requirements of the sedentary jobs, i.e., "working out in front of their bodies, so these are not – this does not require any overhead whatsoever," are also true of the reaching requirements of the light jobs. In short, the light jobs involve working out in front of one's body, so the jobs do not require any overhead whatsoever.

resolve the apparent overhead reaching conflict. Thus, the VE's testimony does not constitute substantial evidence to support the ALJ's finding of "not disabled" at step five … for *any* jobs the VE identified." See Docket Entry 13 at CM/ECF 41 (emphasis in original).

As a part of the step five showing, the ALJ must show that the claimant can perform, or could have performed, jobs existing in significant numbers. See Hall v. Chater, 109 F.3d 1255 (8th Cir. 1997). "Work exists in significant numbers in the national economy when it 'exists in significant numbers either in the region where [the claimant] lives or in several regions of the country.'" See Karen E. v. Kijakazi, No. 21-cv-3015 CJW-MAR, 2022 WL 17548642, 5 (N.D. Iowa Sept. 15, 2022) (quoting 42 U.S.C. 423(d)(2)(A)). The Court of Appeals has not identified a "definitive number of jobs in the national economy that constitutes the lower threshold for a significant number of jobs in the national economy." See Id.

At the administrative hearing, the VE testified to the available number of jobs for a hypothetical individual with Victory's limitations. See Transcript at 54-55. The VE testified that there were approximately 165,000 price marker jobs nationally; 22,000 cafeteria attendant jobs nationally; 9,500 fishing reel assembler jobs nationally; and 8,300 inspecting jobs, such as a table worker, nationally.

The ALJ could properly rely on the VE's testimony that the jobs he identified exist in significant numbers in the national economy. Even were the sedentary jobs disregarded, the ALJ adequately resolved the apparent overhead reaching conflict of the light jobs. The number of total light jobs nationally here, 187,000, is well over the 32,000 jobs nationally that were found to be a "significant number" in Weiler v. Apfel, 179 F.3d 1107, 1111 (8th Cir. 1999) (finding that 32,000 jobs nationally constitutes a "significant number.")

The Court finds, in conclusion, that there is substantial evidence on the record as a whole to support the ALJ's findings, and he did not commit legal error. Victory's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 28th day of April, 2026.

_____
UNITED STATES MAGISTRATE JUDGE